[No. 31923. Department Two. January 15, 1953.]

RUSSELL L. BRACKETT, *Respondent and Cross-appellant*, v. LOUIS R. SCHAFER *et al., Appellants.*[1]

[1] Reported in 252 P. (2d) 294.

*Hall, Cole & Lawrence,* for appellants.

*Allen, Hilen, Froude, DeGarmo & Leedy,* for respondent and cross-appellant.

HAMLEY, J.—This is an action to recover real-estate commissions.

In the spring of 1949, Russell L. Brackett, a licensed real-estate broker, sold his thirty-acre tract at Bellevue, Washington, to Louis R. Schafer and Mrs. Schafer. Schafer is engaged in the home construction business and desired to develop the tract as a subdivision of western style ranch homes. His plan was to subdivide the tract into sixteen lots and build the homes to the order of individual purchasers.

As a part of the transaction between Brackett and the Schafers, the parties entered into a written contract, dated March 3, 1949, designating Brackett exclusive selling agent for the subdivision for a period of one year. Under this contract, the agent was to receive a five per cent commission on each sale consummated. The contract provides that five of the sixteen lots, to be selected by Schafer, were excepted from the agency agreement.

In April, 1949, the tract was surveyed and platted, and became known as the Diamond "S" Ranch. Thereafter, from time to time, Schafer orally advised Brackett that he had prospective purchasers for individual lots, and that he therefore selected such lots to be excepted from the agency agreement. Lots Nos. 2, 3, and 5 were selected in this manner. Schafer also orally advised Brackett that lots Nos. 13 and 14 had been set aside for the construction of a home for Schafer's own use, and he had therefore selected those lots to be excepted from the agency agreement.

Of these five excepted lots, Schafer thereafter sold lots 3 and 5 through direct negotiation with the purchasers, and sold lots 13 and 14 through a real-estate agent other than Brackett. Brackett, having been paid no commission on these sales, seeks, in one cause of action, to recover such commissions in this suit. After a trial to the court, judgment was entered for plaintiff in the sum of twenty-two hundred

dollars, representing a five per cent commission on the sale of lots 13 and 14. The claimed commissions on the sale of lots 3 and 5 were disallowed. Defendants appeal and plaintiff cross-appeals. Because of the cross-appeal, we will continue to refer to the parties as plaintiff and defendants.

In considering defendants' appeal, which involves the sale of lots 13 and 14, it is necessary to recite certain additional facts. As before stated, defendants originally designated these lots as two of the five excepted lots, intending to build a residence thereon for their own use. Before they undertook construction of this residence, plaintiff interested one Olin in the lots. Defendants then orally agreed to release the lots from the exception and pay plaintiff a commission if plaintiff could negotiate a sale of the lots to Olin, including a house to be built to order by defendants.

Defendants thereafter prepared rough plans of a rambling ranch style house for Olin's consideration, but he was not satisfied. Before new plans could be prepared, the possibility developed that Olin might be transferred to another city. In November or December, 1949, Olin therefore suspended or terminated the negotiations. Defendants then proceeded to build and occupy a house for their permanent residence on these lots. While this was a rambling ranch style house, it differed substantially in size and arrangement from the plans submitted to Olin.

In the spring of 1950, defendants found it necessary, for financial reasons, to sell this house. They listed the house for sale with several real-estate brokers, including the John L. Scott agency. It was apparently not relisted with plaintiff, as the latter testified he did not learn that the lots were again for sale until April, 1950. On May 15, 1950, a salesman for John L. Scott showed Olin the plans of the house built by defendants on lots 13 and 14. The prospect that Olin would be transferred out of the city had then disappeared. He inspected the house and decided to buy it. The purchase price was forty-four thousand dollars, and John L. Scott was paid twenty-two hundred dollars, representing the customary five per cent real-estate broker's commission.

The trial court found that the sale of lots 13 and 14 to Olin, on or about May 15, 1950, was a direct result of the interest created by plaintiff's efforts; that plaintiff was the efficient, procuring cause of that sale; and that the sale was made during the existence of the written contract. Defendants' first assignment of error brings into question these findings of fact.

Neither party challenges the finding that the sale to Olin was consummated on May 15, 1950. The question of whether the contract of March 3, 1949, was in effect or had already expired when this sale was made is thus a question of law, to be determined by examining the terms of the contract. There is no contention that the contract was extended by written or oral agreement.

It is the plaintiff's contention that the contract established plaintiff as real-estate broker for the described lots for an indefinite and unspecified time, and authorized him to sell them for a commission. In addition, plaintiff argues, the contract gave him an exclusive agency for the sale of such lots during the first year after execution of the contract. Thus, he contends, defendants not having acted to cancel the contract, it was in effect on May 15, 1950, in so far as plaintiff's general authority to sell was concerned, even though the exclusive agency feature expired on March 2, 1950. The trial court apparently adopted this view.

We do not believe the contract is susceptible of this interpretation. The third preliminary recital of the contract indicates that the agent desires to act as real-estate broker and the owner desires the services of the agent in that capacity. But the actual appointment and designation of plaintiff as agent is made in paragraph No. 1 of the operative provisions of the contract. He is there designated "exclusive agent." There is no other provision in the contract which would indicate that plaintiff was designated in any other capacity than as exclusive agent. On the contrary, paragraph No. 2, which contains the only provision relative to the term of the contract, refers only to the exclusive-agency arrangement. Likewise, paragraph No. 5, which contains

the only provision relative to compensation, contains the customary exclusive-agency arrangement, whereby the agent is entitled to a commission whether or not he negotiates the sale.

Plaintiff calls attention to the fact that, in paragraph No. 7 of the contract, plaintiff is required to encourage and promote the participation and sales efforts of other reputable real-estate brokers, and, under certain circumstances, to enter into a commission arrangement with such other brokers. In our opinion, however, this provision is not inconsistent with the idea that plaintiff was given only an exclusive agency and, in fact, tends to confirm this latter interpretation. It is common practice to require that exclusive agents co-operate with other agents, so the owner may be assured of the widest possible market for sales.

We are therefore of the opinion that plaintiff's authority to sell lots terminated when his exclusive agency expired on March 2, 1950.

■ It is a general rule of universal application that a broker employed for a definite time to effect a sale of property must negotiate the sale within the time fixed to be entitled to his commission. *Kane v. Dawson,* 52 Wash. 411, 100 Pac. 837; *Swift v. Starrett,* 117 Wash. 188, 200 Pac. 1108; *Pavey v. Collins,* 31 Wn. (2d) 864, 199 P. (2d) 571.

An exception to this rule is made where the broker's delay in discharging his duty within the period fixed is due to the fraud or fault of the owner. See *John Davis & Co. v. Aabling,* 117 Wash. 579, 202 Pac. 2. The trial court here made no finding that failure to consummate the sale of lots 13 and 14 prior to March 3, 1950, was due to the fraud or fault of the owner. Nor would the evidence, as reviewed above, support such a finding.

It is our conclusion that the sale of lots 13 and 14 to Olin was not consummated within the term of plaintiff's exclusive-agency contract. Accordingly, the latter is not entitled to recover a commission on such sale. It is unnecessary for us to consider the several other reasons advanced by defend-

ants why the court erred in entering judgment against them in the sum of twenty-two hundred dollars.

Turning to the cross-appeal, we will first consider plaintiff's contention that the trial court erred in disallowing the claimed commission on the sale of lot 5.

Plaintiff contends that, under the contract of March 3, 1949, the five excepted lots were to be designated by number and name of prospective purchaser; that defendants, in complying with this requirement, designated lot 5 as one of the excepted lots, to be sold to a Mrs. Evans; that this sale did not materialize and the designation of lot 5 as an excepted lot therefore lapsed before defendants sold that lot to one Grinstead; and that this lot was therefore subject to the exclusive-agency arrangement entitling plaintiff to a commission whether or not he was the procuring cause of the sale.

The court found that defendants orally designated and thereby selected the five lots to be excepted from the agency agreement, including lot 5; that these selections were made both as to tract number and as to the name of the proposed purchaser or owner thereof; and that, following such designations, defendants arbitrarily and wilfully shifted and changed the designations of these reserved lots to suit their own purposes, from time to time releasing the designated lots for sale independently of, and without notice to, plaintiff.

Thus, at least by inference, the trial court agreed with plaintiff's contention that excepted lots had to be designated both by number and name of prospective purchaser. The court, however, did not specifically find that, in dropping the name of Mrs. Evans as prospective purchaser of lot 5, and accepting Grinstead in lieu thereof, defendants acted arbitrarily or wilfully, nor did it conclude that, by so doing, lot 5 ceased to be an excepted lot.

The court did go on to find that lot 5 was sold directly by defendants and without direct assistance or participation by plaintiff. As plaintiff points out, however, the fact that plaintiff was not a procuring cause of the sale is immaterial if, in fact, the shift in designated purchaser operated to release lot

5 from the exception and place it under the exclusive-agency arrangement.

The pertinent question therefore is: Under the contract of March 3, 1949, was it necessary for defendants, in excepting the five lots from the exclusive-agency arrangement, to make designations both by lot number and name of prospective purchaser?

Plaintiff answers this question in the affirmative and points to the second preliminary recital of the contract. This recital is to the effect that the owner contemplates building a residential dwelling upon each of the parcels when platted "and has proposed transactions" covering five of such homes, including one for himself.

In our view the controlling provision relative to the manner in which the five excepted lots are to be designated, is contained in paragraph No. 1 of the contract, and reads as follows:

" . . . with the exception of five lots regardless of their size or shape, to be selected by the owner for the construction of residences to be used by himself, or to be sold to four or five other persons of his own selection."

This provision requires no more than designation by lot number and plainly indicates that the identity of prospective purchasers of such designated lots is of no concern to plaintiff. The recital clause on which plaintiff relies does not convey the meaning for which he contends. If it did convey such a meaning, it would be immaterial, for recitals may be resorted to in aid of construction only where there is an ambiguity in the operative portion of the agreement. *First Nat. Bank & Trust Co. v. United States Trust Co.*, 184 Wash. 212, 50 P. (2d) 904; *Franklin v. Northern Life Ins. Co.*, 4 Wn. (2d) 541, 104 P. (2d) 310. As before indicated, the operative portion of this agreement, relative to the manner of designating excepted lots, is not ambiguous.

It may be that plaintiff would be entitled to a commission on the sale of lot 5 on some theory of fraud or breach of the contract provisions relative to co-operation, if defendants

had sold lot 5 to a customer whom plaintiff had sought to interest in the unexcepted lots of the subdivision.

While the trial court found that there was arbitrary and wilful shifting of designated prospective purchasers, it did not find that there was fraud or breach of contract entitling plaintiff to recover a commission on this sale. We have examined the evidence and have satisfied ourselves that there is nothing in connection with the sale to Grinstead which is violative of either the letter or spirit of the contract.

It is therefore our conclusion that lot 5 was properly designated as an excepted lot, that it was never released from that designation, and that plaintiff thus has no interest in the sale negotiated between defendants and Grinstead. The trial court did not err in rejecting this claim.

Plaintiff contends, finally, that the trial court erred in disallowing the claimed commission on the sale of lot 3.

In orally designating lot 3 as one of the excepted lots, defendants named one Ramsey as prospective purchaser. This sale did not take place, and in December, 1949, one Norvel Griggs became interested in the lot. Griggs' interest was aroused as a result of his acquaintance with one Hodson, who had purchased a lot in the subdivision through plaintiff's efforts. Griggs dealt only with defendants, and the sale was completed on March 29, 1950.

Plaintiff bases his claim to a commission on this sale on the argument that lot 3 was released from the exception when defendants abandoned Ramsey as a prospective purchaser. Plaintiff recognizes that the sale was made after the one-year exclusive feature of the agency contract had expired. He contends, however, that his authority as general agent under that contract had not been canceled and continued in effect, and that his efforts were the procuring cause of the sale.

The first two of these contentions have already been disposed of in considering the claims regarding lot 5 and lots 13 and 14. The change in prospective purchaser did not release lot 3 from the exception, and in any event, the entire agency contract expired on March 2, 1950. Regarding the third con-

tention, the evidence, as we read it, does not clearly preponderate against the finding of the trial court that defendants sold the lot to Griggs without direct assistance or participation by plaintiff.

The judgment is reversed on the appeal and affirmed on the cross-appeal.

SCHWELLENBACH, HILL, FINLEY, and OLSON, JJ., concur.

